In the United States Bankruptcy Court for the
Northern District of Alabama, Southern Division

| | |
|---|---|
| In Re:<br><br>**CEDRIC D. MCMILLIAN, SR.,**<br>SSS: ###-##-1980<br><br>*Debtor.* | 21-02482-DSC13 |

**CREDITOR DEBRA KELLEY'S RESPONSE IN OPPOSITION TO DEBTOR'S MOTION TO ALTER, AMEND, OR VACATE ORDER OF DISMISSAL**

Creditor Debra Davis Kelley hereby responds in opposition to Debtor's Motion to Alter, Amend, or Vacate Order of Dismissal (Doc. 33). McMillian's bankruptcy has been filed for an improper purpose under the law, namely to frustrate the collection of a judgment that is not dischargeable in bankruptcy. Kelley stands on her prior argument in why McMillian's case should have been dismissed. Debtor's Motion to Alter, Amend, or Vacate is due to be DENIED, or, in the alternative, Kelley should be granted leave to proceed against McMillian individually in Alabama State Court, Case No. 01-CV-2020-900672.00.

### RELEVANT FACTS

**I.    McMillian's Business Loses Debra Kelley's Mother's Body**

1) On February 28, 2014, Cedric D. McMillian, Sr. ("McMillian") formed George Washington Carver Memorial Cemetery LLC ("Carver") by filing a Certificate of Formation with the Jefferson County Probate Court. (Exhibit A). This LLC operates the cemetery known as George Washington Carver Memorial Cemetery.

2) Debra Davis Kelley buried her mother, Gaynell Spencer Perry, in the George Washington Carver Memorial Cemetery on February 28, 2015.

3) On April 8, 2016, Kelley ordered a marker for her mother's grave and provided payment for the marker.

4) On or about May 13, 2017, Kelley went to the Cemetery to visit her mother's grave site but was unable to locate the grave site on her own. Kelley sought the help of Cemetery employees to locate her mother's grave. Cemetery employees directed Kelley to an area of the Cemetery that was different from the place where she knew the burial had taken place.

5) Kelley requested to see the records of the burial plots for the Cemetery, and the Cemetery provided a map to Kelley. According to the Cemetery records, Kelley's mother was not buried where the burial had taken place but had been buried in an entirely different section of the Cemetery.

6) Cemetery employees also notified Kelley that they still had not placed an order for her mother's marker, even though more than a year had passed since she had originally placed the order.

7) Cemetery employees asked Kelley for a few days to research the issue and assured her that they would get in touch with her by May 16, 2017.

8) No one from the Cemetery contacted Kelley prior to May 16, 2017.

9) Kelley called the Cemetery on May 17, 2017 and discovered that Cemetery employees had done no research since Kelley had visited a few days before. Kelley demanded the owner of the Cemetery, McMillian, contact her immediately, and Cemetery employees informed her that they would communicate her request to McMillian.

10) No one from the Cemetery contacted Kelley.

11) Kelley called the Cemetery again on May 19, 2017. Again, Cemetery employees had not done any more research. Again, Kelley requested to speak to McMillian. Again, the Cemetery employees stated McMillian was unavailable. Again, Kelley requested that

McMillian contact her as soon as possible, but, this time, Kelley threatened to hire an attorney.

12) A couple of hours later, a Cemetery employee called Kelley. The Cemetery employee stated that the records indicated Kelley's mother was not buried where Kelley believed her mother was buried. According to the Cemetery employee, the Cemetery groundskeeper checked the area Kelley believed her mother had been buried in and that no one had been buried in that area in years.

13) Skeptical of this, Kelley asked about where a relative of hers had been buried, whom Kelley knew to have been buried in that area in the last nine months.

14) The Cemetery employee admitted that Kelley's relative had been buried in that area, in contradiction to her prior statement, but she refused to admit that Kelley's mother had been buried in the same area.

15) Getting nowhere, yet again, Kelley requested to speak to McMillian. Yet again, the Cemetery employees stated McMillian was unavailable. Yet again, Kelley requested that McMillian contact her as soon as possible.

16) No one from the Cemetery contacted Kelley.

17) Having heard nothing, on May 25 or May 26, 2017, Kelley called the Cemetery and requested a refund for her mother's marker. Conveniently, on this occasion, the Cemetery employees stated that the marker had already been ordered. The Cemetery employees stated that they did not know how to process a refund, and they would have to contact the Cemetery owner, McMillian.

18) Getting nowhere, yet again, Kelley requested to speak to McMillian. Yet again, the Cemetery employees stated McMillian was unavailable. Yet again, Kelley requested that McMillian contact her as soon as possible.

19) No one from the Cemetery contacted Kelley.

20) Sometime later, Kelley called the Cemetery and requested to speak to McMillian. Yet again, the Cemetery employees stated McMillian was unavailable. Yet again, Kelley requested that McMillian contact her as soon as possible. This time, Kelley also asked to make an appointment to speak with McMillian. Kelley said the meeting could be at McMillian's convenience, and she would be in Birmingham on June 15 and June 16, 2017.

21) No one from the Cemetery contacted Kelley.

22) On June 5, 2017, Kelley made a written request for a refund of her mother's marker via letter.

23) No one from the Cemetery contacted Kelley and no refund was issued.

24) On June 22, 2017, Kelley met and hired attorney Jeff Rowell to assist with getting answers from Carver Memorial. Rowell sent two letters to the Cemetery.

25) No one from the Cemetery contacted Rowell or Kelley.

26) On September 26, 2017, attorney Jeff Rowell and Kelley visited the Cemetery in the hopes of meeting with McMillian. On this date, McMillian was actually at the Cemetery and available, and Rowell and Kelley spoke with him. McMillian admitted that there had been a clerical error regarding the burial plot of Kelley's mother.

27) Following this meeting, Kelley contacted the Cemetery for the purpose of confirming that her mother's casket had actually been buried in the plot identified by McMillian.

28) No one from the Cemetery contacted Kelley.

29) Having heard nothing, Kelley again contacted the Cemetery for the purpose of confirming that her mother's casket had actually been buried in the plot identified by McMillian.

30) Yet again, no one from the Cemetery contacted Kelley.

## II. Kelley Sues McMillian and His Cemetery

31) On January 3, 2018, Kelley initiated a lawsuit in Jefferson County's Small Claims Court against Carver and McMillian, case number 01-SM-2018-12. Kelley represented herself through the entirety of that case.

32) On March 1, 2019, the Jefferson County Small Claims Court entered an order awarding to Kelley $8,500.00 and court costs against both Carver and McMillian, jointly and severally (the "Judgment" attached as Exhibit B).[1]

33) Mere hours after the entry of the Judgment against him and before Kelley had received notice that she had been successful, McMillian, through his attorney, demanded that Kelley pay even more money to have her mother disinterred, and he refused to permit any third party to disinter the body, even after his company's repeated wantonness had been reduced to a judgment. (Exhibit C).

34) On February 18, 2020, after McMillian had continued to refuse to satisfy the judgment against him and his company, Kelley filed a Complaint in the Circuit Court for Jefferson County, Alabama against George Washington Carver Memorial Cemetery, LLC, Beverly McMillian, Zion Memorial Gardens, LLC and McMillian Cemeteries, LLC, case number 01-CV-2020-900672.00 (the "State Court Case"). McMillian was explicitly exempt from the State Court Case initially because he was still in bankruptcy at that time.

35) To date, neither Carver nor McMillian have made any attempt to satisfy Kelley's Judgement.

36) To date, no one from the Cemetery has been able to conclusively identify where Gaynell Spencer Perry is buried.

---

[1] The March 1, 2019, judgment is void as a matter of law as against McMillian because of the bankruptcy's automatic stay. *Ellison v. Northwest Eng'g Co.,* 707 F.2d 1310, 1311 (11th Cir. 1983).

37) To date, no one from the Cemetery has communicated to Kelley where her mother is buried.

38) To date, no one from the Cemetery has confirmed that there are *any* caskets buried in *any of the plots* the Cemetery has identified as being the plots where Perry is buried.

39) Much less, no one from the Cemetery has been able to confirm that the casket in *any of the plots* identified by the Cemetery are Perry's casket.

III. McMillian's History of Abusing the Legal Process

40) On June 6, 2017, McMillian obtained an entry of divorce from his then wife, Beverly Cole McMillian. In granting the divorce, the Court found that "McMillian has managed and operated [the cemeteries owned by McMillian Cemeteries, LLC] since they were acquired and they are his sole source of income." (Exhibit D, para. 8). The Court also found that McMillian's monthly income is $17,500. (*Id.* at para. 9). The Court also found that McMillian "has been less than forthcoming about his income and assets and has on numerous times failed to provide requested documents." (*Id.* at para. 15). As a result of the divorce, McMillian was ordered full right, title, and interest to George Washington Carver Memorial Cemetery, LLC and McMillian Cemeteries, LLC.

41) On February 4, 2019, McMillian filed a petition for voluntary bankruptcy under Chapter 13 with the United States Bankruptcy Court for the Northern District of Alabama, case number 19–00440–DSC13. In that petition, McMillian swore, under penalty of perjury, that he was not the "sole proprietor of any full- or part time business." (Exhibit E, p. 4).

42) McMillian would later file asset schedules failing to disclose his interest in Carver or the Cemetery. (Exhibit D, p. 6). McMillian also represented to the bankruptcy court that he had no ownership in any business property, such as a cemetery. (Ex. F at p. 7). McMillian even brazenly admitted that the entirety of his income, consisting of some $8,143.00 per month, was entirely generated from "Net income from rental property and from operating a

*6 of 10*
Case 21-02482-DSC13   Doc 37   Filed 03/01/22   Entered 03/01/22 16:04:49   Desc Main Document    Page 6 of 10

business, profession, or farm," none of which was ever disclosed anywhere else in McMillian's asset report. (Ex. F at 20).

43) In a hearing on his Motion to Dismiss in the State Court Case on September 3, 2020, McMillian's counsel represented to that court that the Cemetery was owned by him personally, subject to the bankruptcy stay, such that that case needed to be dismissed. In that hearing, Kelley's counsel put forth evidence, including McMillian's bankruptcy asset schedules, that the Cemetery was owned by McMillian through an LLC, which was not subject to the bankruptcy proceeding, and therefore not subject to the stay. McMillian's counsel further represented that the Cemetery was held by McMillian personally, and not an LLC.

44) On June 9, 2020, the bankruptcy trustee filed a motion to dismiss McMillian's bankruptcy case because McMillian was not making payments as agreed and ordered. That motion was conditionally denied on July 1, 2020. The bankruptcy trustee filed notices of continuing default on August 3, 2020, and November 18, 2020.

45)

46) On July 12, 2021, the bankruptcy trustee filed another Motion to Dismiss Case for Failure to Make Plan Payments. That Motion was heard on August 17, 2021, at which time McMillian represented, through counsel, that he no longer wished to pursue the bankruptcy action and consented to a dismissal, both of which were noted on the record and later reduced to an order.

47) Kelley immediately took action in the state court action by moving to amend pleadings to add McMillian as an individual defendant in that case on the same day, August 17, 2021. That motion was granted, in its entirety, on September 24, 2021.

48) Before Kelley was able to file and serve an amended complaint on McMillian pursuant to the state court order, McMillian filed this bankruptcy action on October 21, 2021.

49) Only a month later, the Bankruptcy Trustee filed to dismiss McMillians' second bankruptcy as McMillian, once again, was not making payments under the plan. (Doc. 24).

50) That motion was heard on January 4, 2022. Kelley appeared through counsel at that hearing. McMillian failed to show at that hearing and his attorney represented to the Court that McMillian had not spoken with his counsel for a long time prior to the hearing. As a result of the Trustee's and Kelley's motions, and McMillian's failure to appear, the Court dismissed McMillian's bankruptcy, once again.

IV. **McMillian Continues to Operate a Deplorable and Fraudulent Business**

51) Despite the numerous claims made against him and his cemetery business, McMillian appears to show no remorse or to take any steps to rectify the problems.

52) McMillian's cemetery was the subject of two separate news reports by local CBS news, highlighting the deplorable conditions at his cemetery.

53) On October 11, 2021, WVTM13 ran a story about George Washington Carver Cemetery's neglect of another plot. (https://www.wvtm13.com/article/cemetery-concerns-at-george-washington-carver-memorial-gardens-in-birmingham/37930495)

54) Only a few days later, WVTM13 ran a follow up story because of the numerous individuals coming forward with other problems they had experienced at George Washington Carver Cemetery. Shockingly enough, others reported experiencing the exact issues that Kelley had experienced, including even one that also had her relative's body lost by McMillian's cemetery. (https://www.wvtm13.com/article/cemetery-chaos-at-george-washington-carver-memorial-gardens-in-birmingham/37966400).

**ARGUMENT**

The Debtor is not entitled to alter, amend, or vacate the final order dismissing his bankruptcy because he has failed to provide sufficient justification for reinstating his case.

The Debtor operates a cemetery that lost Gaynell Spencer Perry's body. Not only did the Cemetery lose the body, the Debtor, as the Cemetery's operator appears to be remorseless and continues to frustrate Kelley's attempts to locate her mother's remains without good cause, even after a judgment. In short, the liability that the Debtor is exposed to is not one that could be discharged in bankruptcy, and reinstatement only permits the Debtor to continue to drag out final adjudication in that case, to the prejudice of Kelley.

Debtor's refusal to pay under the plan payments is only part of his deficiency. This is Debtor's second dismissal for failure to pay. Debtor has failed to provide any justification for why he failed to make not just the three payments in this case, but also the dozen other payments giving rise to the dismissal in his last case. Further, Debtor provides no justification for why he failed to show at the hearing to dismiss or otherwise communicate with his lawyer prior to the hearing on the dismissal of this case.

Debtor has not been truthful with this Court or the Alabama Court regarding the possession of his assets. Debtor has taken two contradictory positions: that the Cemetery he operates, which comprises one of his largest assets and his sole source of income, is held both by himself directly, which would be subject to this bankruptcy, and through an LLC, which is not subject to this bankruptcy. Debtor has represented to this Court that he does not own such a business. (Exhibit D, p. 6 and Ex. F at p. 7). Yet he has taken the exact opposite position in the State Court Case. Debtor has not filed or offered to file amended schedules to correct this position or to notify the Alabama State Court that the prior representations were untrue. Until that discrepancy is corrected, Debtor should not be entitled to reinstatement.

In the alternative, should Debtor be granted reinstatement, Kelley moves that she be granted leave to pursue her case against McMillian in the State Court Case pursuant to 11 U.S.C. § 1301.

*9 of 10*

Case 21-02482-DSC13   Doc 37   Filed 03/01/22   Entered 03/01/22 16:04:49   Desc Main
Document      Page 9 of 10

## PRAYER FOR RELIEF

WHEREFORE, McMillian's bankruptcy has been filed for an improper purpose under the law, namely to frustrate the collection of a judgment that is not dischargeable in bankruptcy. McMillian's Motion for an Extension of the Automatic Stay is due to be DENIED and the Trustee's Motion to Dismiss should be GRANTED, or, in the alternative, Kelley should be granted leave to proceed against McMillian individually in Alabama State Court, Case No. 01-CV-2020-900672.00.

Respectfully submitted,
/s/ Joseph E. "Tripp" Watson, III
Joseph E. "Tripp" Watson, III
Attorney for Creditor Debra D. Kelley
The Watson Firm
2007 3rd Avenue North
Birmingham, Alabama 35203
205.545.7278
tripp@watson-firm.com

## CERTIFICATE OF SERVICE

I certify that on Tuesday, March 1, 2022, I served a copy of this document on the parties listed below by ☐ First-Class Mail ☐ Certified Mail ☐ electronic mail ☒ notice through electronic filing ☐ hand-delivery:

C TAYLOR CROCKETT
Attorney for Cedric D. McMillian, Sr.
taylor@taylorcrockett.com

/s/ Joseph E. "Tripp" Watson, III